# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00213-CV

**Susan Combs, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas, Appellants**

**v.**

**Texas Entertainment Association, Inc. and Karpod, Inc., Appellees**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
## NO. D-1-GN-07-004179, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING

## O P I N I O N

The Comptroller of Public Accounts and the Attorney General of the State of Texas[1] appeal the trial court's judgment in a suit for declaratory and injunctive relief brought by Texas Entertainment Association, Inc. ("TEA"), and Karpod, Inc. The trial court's judgment declared subchapter B of chapter 47 of the business and commerce code unconstitutional and permanently enjoined the Comptroller from assessing or collecting the tax imposed by that subchapter.[2] *See* Tex. Bus. & Com. Code Ann. §§ 47.051-.056 (West Supp. 2008). Because we hold

---

[1] Because the appellants' interests are aligned, we will refer to them collectively as "the Comptroller."

[2] For purposes related to TEA and Karpod's state constitutional claims, the parties dispute whether the assessment at issue in this case is properly considered a tax or a fee. We will adopt the language of the trial court's order, which refers to the assessment as a tax. However, because we need not reach the state constitutional claims in this appeal, we express no opinion on whether the assessment imposed by subchapter B is properly considered a tax or a fee.

that subchapter B violates the First Amendment to the United States Constitution, we affirm the

trial court's judgment.[3]  *See* U.S. Const. amend. I.

## BACKGROUND

In 2007, the Texas Legislature enacted chapter 47, subchapter B, of the business and

commerce code, which imposes a tax "on a sexually oriented business in an amount equal to $5 for

each entry by each customer admitted to the business."  Tex. Bus. & Com. Code Ann. § 47.052(a).

The statute further defines a sexually oriented business ("SOB") as:

> a nightclub, bar, restaurant, or similar commercial enterprise that:
>
> (A) provides for an audience of two or more individuals live nude entertainment or live nude performances; and
>
> (B) authorizes on-premises consumption of alcoholic beverages, regardless of whether the consumption of alcoholic beverages is under a license or permit issued under the Alcoholic Beverage Code.

*Id.* § 47.051(2).  As a result, the tax applies only to businesses that permit alcohol consumption in

the presence of live, nude entertainment.  "Nude" is defined as "entirely unclothed" or "unclothed

in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of

the breasts below the top of the areola of the breasts, if the person is female, or any portion of the

genitals or buttocks."  *Id.* § 47.051(1).  A business subject to the tax is not required to impose the

tax on its customers, but may use its discretion in determining how it will derive the money required

to pay the tax.  *Id.* § 47.052(c).  The legislature allocated the first $25 million in revenue received

---

[3]  After oral argument was heard in this case, both sides requested leave to file post-submission briefs.  Those motions are hereby granted.

2

from the SOB tax to the State's sexual assault program fund and the remaining revenue to the Texas health opportunity pool to fund health insurance for low-income Texans. *Id.* §§ 47.054-.055. The SOB tax went into effect on January 1, 2008.[4]

In response to the enactment of subchapter B, Karpod, a sexually oriented business, and TEA, an association representing the interests of sexually oriented businesses in Texas, filed suit for declaratory and injunctive relief against the Comptroller, asserting that the tax violated the state and federal constitutions. After a bench trial, the trial court issued a declaratory judgment that the statute violated the First Amendment to the United States Constitution, permanently enjoined the Comptroller from collecting or assessing the tax, and awarded attorneys' fees in favor of TEA and Karpod.[5] This appeal followed.

## DISCUSSION

On appeal, the Comptroller argues (1) that the SOB tax does not violate the First Amendment, (2) that the SOB tax does not violate the Texas Constitution, (3) that sovereign immunity bars suit by TEA, and (4) that the trial court erred in awarding attorneys' fees.

### The First Amendment

We note at the outset that "the fact that protected speech may be offensive to some does not justify its suppression." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 701 (1977). In fact,

---

[4] During the 2007 session, the legislature also repealed chapter 47 of the business and commerce code, effective April 1, 2009, as part of a nonsubstantive statutory revision program. *See* Act of May 15, 2007, 80th Leg., R.S., ch. 885, § 2.47(a)(1), 2007 Tex. Gen. Laws 1905, 2082. Subchapter B of chapter 47 was enacted without reference to this repeal.

[5] In light of its finding that the statute is unconstitutional under the First Amendment, the trial court declined to reach TEA and Karpod's state constitutional claims.

"it is in those instances where protected speech grates most unpleasantly against the sensibilities that judicial vigilance must be at its height." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 87 (1976) (plurality opinion) (Stewart, J., dissenting).

In conducting our First Amendment analysis, we must first determine whether the SOB tax is subject to strict or intermediate scrutiny. Content-based restrictions on speech are presumptively invalid and subject to strict scrutiny. *See, e.g.*, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) (plurality opinion). In order to withstand strict scrutiny, a statute must be narrowly tailored to promote a compelling government interest. *See, e.g.*, *United States v. Playboy Entm't Group, Inc.*, 529 U.S. 803, 813 (2000). The Comptroller concedes that the SOB tax cannot survive a strict scrutiny analysis, arguing instead that the tax is content-neutral and therefore subject to intermediate scrutiny. A content-neutral restriction on speech withstands intermediate scrutiny "if the conduct itself may constitutionally be regulated, if the regulation is narrowly drawn to further a substantial governmental interest, and if the interest is unrelated to the suppression of free speech." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based," while "laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 643 (1994). The principal inquiry in determining content neutrality "is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against*

4

*Racism*, 491 U.S. 781, 791 (1989). Rules are generally considered content-based when the regulating party must examine the speech to determine if the restriction applies. *See, e.g.*, *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987); *FCC v. League of Women Voters of Cal., Inc.*, 468 U.S. 364, 383 (1984).

While nude dancing "falls only within the outer ambit of the First Amendment's protection," it is nevertheless protected as expressive conduct. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000) (plurality opinion). In arguing that the SOB tax is subject to intermediate scrutiny, the Comptroller points to cases in which the U.S. Supreme Court has applied intermediate scrutiny to zoning restrictions aimed at the secondary effects of businesses offering adult entertainment. *See Alameda Books*, 535 U.S. at 434 (plurality opinion) (zoning ordinance prohibiting more than one "adult entertainment business" in single building); *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (zoning ordinance restricting location of adult movie theaters); *Young*, 427 U.S. at 71-72 (plurality opinion) (same).

Unlike the restrictions at issue in *Alameda Books*, *Renton*, and *Young*, the SOB tax is not a zoning restriction, but a tax on businesses that offer live, nude entertainment in the presence of alcohol.[6] The U.S. Supreme Court has suggested that zoning restrictions directed to secondary effects of speech are inherently different from other types of restrictions on speech. *See Alameda*

---

[6] While the Comptroller characterizes the SOB tax as a "modest fee" of five dollars per customer, "the level of the fee is irrelevant. A tax based on the content of speech does not become more constitutional because it is a small tax." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 136 (1992).

*Books*, 535 U.S. at 449 (plurality opinion) (Kennedy, J., concurring)[7] ("[Z]oning regulations do not automatically raise the specter of impermissible content discrimination . . . because they have a prima facie legitimate purpose:  to limit the negative externalities of land use. . . . [T]hese sorts of ordinances are more like a zoning restriction on slaughterhouses and *less like a tax on unpopular newspapers*.") (emphasis added); *Young*, 427 U.S. at 62, 73 n.35 (plurality opinion) (stating that the zoning ordinance's restrictions are so minimal that "the market for this commodity is essentially unrestrained" and that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech").  Because zoning ordinances are distinguishable from other restrictions on speech, we do not find the First Amendment analyses applied in zoning cases to be particularly relevant to the present case.  *See Alameda Books*, 535 U.S. at 445 (plurality opinion) (Kennedy, J., concurring) (stating that city could regulate secondary effects of adult entertainment businesses with zoning ordinance, but could not suppress the speech itself by, "for example, imposing a content-based fee or tax").

Furthermore, while the Supreme Court has held that bans on public nudity should be reviewed with intermediate scrutiny as content-neutral restrictions, the public-nudity bans at issue in those cases did not single out a specific class of First Amendment speakers, as the SOB tax does. *See Pap's A.M.*, 529 U.S. at 290 (plurality opinion) ("By its terms, the ordinance regulates conduct

---

[7] Because Justice Kennedy concurred in the judgment of the Court on the narrowest grounds, his concurrence represents the Court's holding in *Alameda Books*. *See Marks v. United States*, 430 U.S. 188, 194 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.") (internal quotation marks and citation omitted).

alone. It does not target nudity that contains an erotic message; rather, it bans all public nudity, regardless of whether that nudity is accompanied by expressive activity."); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 571 (1991) (plurality opinion) ("Indiana, of course, has not banned nude dancing as such, but has proscribed public nudity across the board. . . . Public nudity is the evil the State seeks to prevent, whether or not it is combined with expressive activity.").

Having found the cases involving zoning restrictions and total nudity bans inapplicable to the present case, we now turn to the body of law addressing differential taxation of First Amendment speakers. The SOB tax targets a small group of taxpayers engaged in expression protected by the First Amendment, even if only marginally so. *See Barnes*, 501 U.S. at 566 (plurality opinion). A tax imposed on a small group of First Amendment speakers, particularly a group conveying a message that the taxing body might consider undesirable, carries a greater risk of suppressing speech than a zoning ordinance because "the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819). As the Supreme Court stated in *Leathers v. Medlock*:

> [D]ifferential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints. . . . A tax is also suspect if it targets a small group of speakers. Again, the fear is censorship of particular ideas or viewpoints. Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech.

499 U.S. 439, 447 (1991) (citations omitted). "A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected." *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983).

7

A selective taxation scheme in which an entity's tax status depends entirely on the content of its speech is "particularly repugnant to First Amendment principles." *Arkansas Writers' Project*, 481 U.S. at 229. As a result, differential taxation based on content is subject to strict scrutiny. *Id.* at 231. A taxing statute is content-based if it "singles out income derived from expressive activity for a burden the State places on no other income, and it is directed only at works with a specified content." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991). Where taxing authorities must necessarily examine the content of the message that is conveyed, "[s]uch official scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible" with the First Amendment. *Arkansas Writers' Project*, 481 U.S. at 230.

Testimony at trial revealed that in order to determine whether the SOB tax should be assessed against a particular taxpayer, representatives from the Comptroller's office would be required to examine the content of the expressive conduct. For example, Steven White, a program specialist in the Comptroller's tax policy division, testified that if a play involving nudity was held at a bar or other establishment that serves alcohol, the owner of the establishment would not be subject to the SOB tax because "the main ingredient of the performance is not necessarily that of live nude entertainment." White also testified that a comedy show involving nudity at a venue where alcohol is sold would not trigger the SOB tax, because "the essence of that performance is not necessarily one of live nude entertainment." White further explained that a bar hosting a "wet t-shirt contest" or a bar at which bartenders periodically perform dance routines and become nude as defined by the statute would be subject to the tax. Similarly, Emma Fuentes, an auditor in the

8

Comptroller's office testified, "Using my own judgment, I would look at the taxpayer we're auditing. If it's like a theater that puts on plays and concerts I would think that maybe this fee was not appropriate for them . . . [b]ecause the whole essence of the transaction to me would be for somebody to go see a play and not so much a sexually oriented business." These examples reveal that the SOB tax is not imposed in all incidents where live nude entertainment occurs in the presence of alcohol, but only in those situations in which the taxing authority—the Comptroller—determines, after examining the content of the expression, that it represents the "essence" of live nude entertainment. This type of differential taxation based on content is precisely the type of restriction warranting strict scrutiny in *Arkansas Writers' Project*, *Minneapolis Star*, and *Simon & Schuster*.

The bulk of the testimony at trial focused on the Comptroller's argument that the SOB tax is aimed at reducing the secondary effects of sexually oriented businesses. However, a tax on speech is not necessarily content-neutral simply because it is aimed at secondary effects. *See Forsyth County*, 505 U.S. at 134. While intermediate scrutiny is applied to zoning regulations aimed at decreasing secondary effects, zoning regulations are distinguishable from differential taxation statutes, as previously discussed. *See Alameda Books*, 535 U.S. at 449 (plurality opinion) (Kennedy, J., concurring) (stating that designation of zoning restrictions on adult entertainment businesses as "content-neutral" is legal fiction used because "[t]he zoning context provides a built-in legitimate rationale, which rebuts the usual presumption that content-based restrictions are unconstitutional"). In light of this distinction, evidence that the SOB tax is aimed at reducing secondary effects of sexually oriented businesses does not preclude the proper application of strict scrutiny in this case.

The Comptroller also argues that the State has the power to categorically ban nude dancing or the sale of alcohol in the presence of nude dancing, and therefore the SOB tax must be constitutionally permissible because it is less restrictive than a total ban. First, the Supreme Court cases relied upon by the Comptroller for the proposition that the State may ban nude dancing altogether refer, as previously discussed, to content-neutral bans on nudity in general, rather than specific prohibitions on nude dancing. *See Pap's A.M.*, 529 U.S. at 290 (plurality opinion); *Barnes*, 501 U.S. at 566, 571 (plurality opinion). Second, with regard to the power to ban alcohol in the presence of nude dancing, the Supreme Court held in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996), that "the Twenty-first Amendment does not qualify the constitutional prohibition against laws abridging the freedom of speech embodied in the First Amendment." In other words, a state's regulatory power over the sale and use of alcoholic beverages under the Twenty-first Amendment cannot be used to shield the suppression of speech from constitutional scrutiny. *See id.*[8]

Furthermore, we disagree with the Comptroller's *a fortiori* argument that if a government may, in the interest of public safety, ban alcohol in the presence of nude dancing, it may also impose a tax on establishments that provide alcohol in the presence of nude dancing. The

---

[8] We note that the Court's holding in *44 Liquormart* did not foreclose the possibility of a state using its inherent police power to place restrictions on the sale of alcohol in the presence of nude dancing. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996). However, such use of a state's police power must satisfy First Amendment scrutiny. *See Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 80 (1976) (plurality opinion) (Powell, J., concurring) (stating that "no aspect of the police power enjoys immunity from searching constitutional scrutiny").

reason this argument fails is best addressed by the following analogy posited by the U.S. Supreme Court:

> [T]he situation becomes the same as if California law forbade shouting fire in a crowded theater, but granted dispensations to those willing to contribute $100 to the state treasury. While a ban on shouting fire can be a core exercise of the State's police power to protect the public safety, and can thus meet even our stringent standards for regulation of speech, adding the unrelated condition alters the purpose to one which, while it may be legitimate, is inadequate to sustain the ban. Therefore, even though, in a sense, requiring a $100 tax contribution in order to shout fire is a lesser restriction on speech than an outright ban, it would not pass constitutional muster.

*Nollan v. California Coastal Comm'n*, 483 U.S. 825, 837 (1987). As this hypothetical suggests, the power to ban speech pursuant to a government's police power does not presuppose the power to impose a financial disincentive on such speech. This reasoning is even more applicable in the present case because the act of shouting fire in a crowded theater, unlike nude dancing, is not subject to First Amendment protection at all. *See Schenck v. United States*, 249 U.S. 47, 52 (1919).

The Supreme Court has held that while a government has the power to regulate the use and sale of alcohol, it "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially his interest in freedom of speech." *44 Liquormart*, 517 U.S. at 513 (internal quotation marks and citation omitted). "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)). This is precisely what the State seeks to do in the present case. By conditioning the ability to sell alcohol on the forfeiture of a

11

First Amendment right, the State attempts to produce a result—the imposition of a content-based tax on speech—which it could not command directly.[9]

Furthermore, we disagree with the Comptroller's characterization of the SOB tax as an alcohol regulation, rather than a tax on speech. While it is true that a sexually oriented business owner may avoid the tax by choosing not to allow the consumption of alcohol on the premises, this aspect of the SOB tax is insufficient to transform a content-based tax into a content-neutral alcohol regulation. In reviewing the plain language, context, and legislative history of the relevant statutory provisions, we are not convinced that "the statute's predominant purpose is with regulating the service of alcohol," as was the case in *Illusions - Dallas Private Club, Inc. v. Steen*, 482 F.3d 299, 309 (5th Cir. 2007), in which the Fifth Circuit applied intermediate scrutiny to a provision of the Texas Alcoholic Beverage Code prohibiting sexually oriented businesses from obtaining private club permits from the Texas Alcoholic Beverage Commission (TABC) to serve alcohol in dry counties. *See* Tex. Alco. Bev. Code Ann. § 32.03(k) (West 2007). In *Illusions*, the Fifth Circuit held that the statute at issue was "part of a 'web' of alcohol regulations," which are unrelated to the suppression of speech, and emphasized the statutory context of the prohibition within the alcoholic beverage code, where it appears alongside other provisions allowing TABC to regulate the sale of alcohol. 482 F.3d at 309; *see also id.* at 308 (concluding "that § 32.03(k) is subject to intermediate scrutiny

---

[9] The fact that there is no constitutional right to provide alcohol in the presence of nude dancing is immaterial because "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely," including those that demand the surrender of a constitutional right. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

because its predominant purpose, as exhibited by its plain text and its place within the Texas Alcoholic Beverage Code, is unrelated to the suppression of speech").

The SOB tax, on the other hand, is not part of a "web" of alcohol regulations imposed by the alcoholic beverage code, but appears in chapter 47 of the business and commerce code, which governs sexually oriented businesses. The SOB tax is remitted to the Comptroller, *see* Tex. Bus. & Com. Code Ann. § 47.053, and, unlike the statutory provision at issue in *Illusions*, does not involve the regulatory oversight of TABC.[10] The original version of the SOB tax proposed in the legislature and passed by the House of Representatives made no mention of alcohol at all. *See* Tex. H.B. 1751, 80th Leg., R.S. (2007) (as passed by House, May 9, 2007). The bill was later amended in the Senate to restrict the pool of taxpayers to those sexually oriented businesses that allowed alcohol on the premises. *See* S.J. of Tex., 80th Leg., R.S. 3043 (2007). As TEA and Karpod point out in their briefs, this change mirrored a similar amendment originally proposed in the House, *see* H.J. of Tex., 80th Leg., R.S. 3573 (2007), after a hearing before the House Ways and Means Committee, in which there was some discussion regarding the additional audit burden that the SOB

---

[10] TABC is authorized to "exercise all powers, duties, and functions conferred by" the alcoholic beverage code, and "shall inspect, supervise, and regulate every phase of the business of manufacturing, importing, exporting, transporting, storing, selling, advertising, labeling, and distributing alcoholic beverages, and the possession of alcoholic beverages for the purpose of sale or otherwise." Tex. Alco. Bev. Code Ann. § 5.31 (West 2007).

We note also that chapter 183 of the tax code, which imposes a tax on gross receipts derived from the sale of "mixed beverages," includes a "conflict of rules" provision to govern conflicts between regulations issued by TABC and those issued by the Comptroller in the collection of the tax. *See* Tex. Tax Code Ann. § 183.052 (West 2008). No similar provision appears in the SOB tax statute, suggesting that the legislature did not contemplate the exercise of TABC's regulatory authority in connection with the SOB tax.

13

tax would impose on the Comptroller's office, the convenience of "joining forces" with TABC for audit purposes, and the logistical difficulties in auditing sexually oriented businesses that are not regulated by TABC.[11] *See* Hearing on Tex. H.B. 1751 Before the House Comm. on Ways & Means, 80th Leg., R.S. 39-42 (March 14, 2007). Beyond this discussion regarding the efficiency and convenience of combining the audit resources of TABC and the Comptroller's office, the legislative history of subchapter B of chapter 47 of the business and commerce code includes no references to the regulation of alcohol.

Reviewing the SOB tax provisions in their statutory context, we conclude that, unlike the provision at issue in *Illusions*, the predominant purpose of the SOB tax is not to regulate the service of alcohol. *See* 482 F.3d at 309, 310 n.7 (concluding that statute has predominant purpose of regulating alcohol and is therefore content-neutral because "the text of the statute and its statutory context" suggest that it "is more in the nature of a typical alcohol regulation" and less in the nature of a law suppressing speech). Despite the limitation of the SOB tax burden to businesses that allow the consumption of alcohol, the SOB tax remains a content-based differential tax burden on protected speech, and is subject to strict scrutiny. *See, e.g.*, *Arkansas Writers' Project*, 481 U.S. at 230 (stating that such tax burdens are "entirely incompatible" with First Amendment).

---

[11] During the hearing, a representative from the Comptroller's office testified that the SOB tax would create "an additional audit burden" and stated that "these particular establishments are regulated by the TABC and they are subject to audit already by the TABC," so "[h]opefully we can join forces with the TABC." When asked, "Is the bill specifically tied to those entities that are selling liquor? If it is not, how are you going to [audit] the entities that don't sell liquor?" the Comptroller's representative answered, "Well, I believe we would be on our own on that case."

14

The Comptroller concedes that the SOB tax cannot withstand strict scrutiny. As the trial court stated in its judgment, "Defendants failed to—and conceded that they cannot—meet their burden to show that [the tax] is necessary to serve a compelling state interest and narrowly tailored for that purpose." In light of the Comptroller's concession and our determination that the SOB tax is a content-based tax subject to strict scrutiny, we hold that the SOB tax is unconstitutional under the First Amendment.[12] The Comptroller's first issue is overruled. Having found the SOB tax unconstitutional under the First Amendment, we need not reach the Comptroller's second issue regarding Karpod and TEA's state constitutional claims.

### Sovereign Immunity

In its third issue on appeal, the Comptroller argues that TEA, as an organization that is not subject to the SOB tax, is barred from bringing suit on the basis of sovereign immunity. *See*

---

[12] Even if we were to consider the SOB tax to be content-neutral, it would fail constitutional muster under the intermediate-scrutiny standard because it is not narrowly tailored to further a substantial governmental interest. *See Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (citing *United States v. O'Brien*, 391 U.S. 367, 376 (1968)). In determining whether a restriction on speech is narrowly tailored, "the validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct." *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989). In the present case, the majority of the proceeds resulting from the SOB tax are allocated for a purpose that, while laudable, bears no relation to the overall problem that the State claims it is seeking to correct—the negative secondary effects of nude dancing when combined with alcohol. While the first $25 million in revenue per biennium is allocated to the sexual assault program fund, the remainder—and the vast majority—of the revenue is dedicated to providing health insurance to low-income individuals. *See* Tex. Bus. & Com. Code Ann. §§ 47.054-.055 (West Supp. 2008). The Comptroller presented no evidence at trial of a link between a lack of health insurance and nude dancing where alcohol is consumed. Because the State has imposed a tax on protected speech and allocated only a fraction of the proceeds to combat secondary effects, there is "an inadequate nexus between the regulation and the interest sought to be served." *Clark*, 468 U.S. at 299 n.8; *see also Ward*, 491 U.S. at 799 ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.").

15

*State v. Holland*, 221 S.W.3d 639, 643 (Tex. 2007) ("Absent an express waiver of its sovereign immunity, the State is generally immune from suit."). The Comptroller asserts that TEA cannot take advantage of the waiver of sovereign immunity found in the tax-protest provisions of the tax code because these provisions apply only to taxpayers. *See* Tex. Tax Code Ann. §§ 112.052, .101 (West 2008); *see also Rylander v. Bandag Licensing Corp.*, 18 S.W.3d 296, 302 (Tex. App.—Austin 2000, pet. denied) ("The Tax Code provides a statutory remedy for taxpayers who contend a tax is unlawful or may not legally be demanded.").

While the tax code does provide a remedy for taxpayers seeking to challenge the legality of a tax, such a challenge may also be brought in a suit for declaratory relief under the Texas Uniform Declaratory Judgments Act (UDJA), Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2008), as TEA has done in the present case. *See Bandag Licensing*, 18 S.W.3d at 303. This Court has held that "[a] suit seeking a declaratory judgment that a state agent is acting pursuant to an unconstitutional law is not an action against the State barred by sovereign immunity." *Rylander v. Caldwell*, 23 S.W.3d 132, 136 (Tex. App.—Austin 2000, no pet.).[13] Declaratory-judgment actions against state officials challenging the constitutionality of a statute "do not implicate the sovereign-immunity doctrine" because they are not considered "suits against the State." *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002). Because the

---

[13] The Comptroller argues that *Caldwell* contradicts the Texas Supreme Court's decision in *W.D. Haden Co. v. Dodgen*, 308 S.W.2d 838 (Tex. 1958). However, in *Dodgen*, the court expressly distinguished between suits "to compel performance of or to enforce rights arising out of a contract with a state agency," which are considered suits against the State for purposes of sovereign immunity, and suits seeking a determination of a person's rights when state officials act outside their lawful authority, which are not considered suits against the State for sovereign-immunity purposes. 308 S.W.2d at 840. This Court's holding in *Caldwell* is consistent with this distinction.

present case falls within this category of cases for which the sovereign-immunity doctrine does not apply, we hold that TEA is not barred from bringing suit.[14] The Comptroller's third issue on appeal is overruled.

***Attorneys' Fees***

In its fourth issue on appeal, the Comptroller argues that Karpod is not entitled to attorneys' fees under the UDJA because its UDJA claim is redundant to the legal remedy provided by the tax-protest provisions of the tax code. *See* Tex. Tax Code Ann. §§ 112.052, .101. The Comptroller contends that Karpod improperly brought its UDJA claim solely as a vehicle to obtain attorneys' fees. *See Texas State Bd. of Plumbing Exam'rs v. Associated Plumbing-Heating-Cooling Contractors of Tex., Inc.*, 31 S.W.3d 750, 753 (Tex. App.—Austin 2000, pet. dism'd by agr.) ("It is an abuse of discretion . . . to award attorney's fees under the UDJA when the statute is relied upon solely as a vehicle to recover attorney's fees.").

Chapter 112 of the tax code allows taxpayers to seek a return of taxes paid under protest, *see* Tex. Tax Code Ann. § 112.052, and an injunction prohibiting the assessment or collection of a tax, *see id.* § 112.101.[15] If a party requests a declaration under the UDJA that goes beyond its request pursuant to the tax code, the UDJA claim is not considered a redundant remedy. *See Strayhorn v. Raytheon E-Systems, Inc.*, 101 S.W.3d 558, 572 (Tex. App.—Austin 2003,

---

[14] On appeal, the Comptroller does not contest TEA's associational standing to bring suit. *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) (requirements for associational standing).

[15] Chapter 112 also allows taxpayers to bring a refund suit, *see* Tex. Tax Code Ann. § 112.151 (West 2008), which is distinct from a tax-protest suit, *see id.* § 112.052 (West 2008). Karpod did not seek a refund under section 112.151.

17

pet. denied) (distinguishing between taxpayer that "requested a statutory interpretation that went beyond its request for a tax refund," for which UDJA claim would not be redundant, and taxpayer seeking declaration that denial of refund claim was unlawful, for which UDJA claim would be redundant). In addition, the issues to be determined in a tax-protest suit "are limited to those arising from the reasons expressed in the written protest as originally filed." Tex. Tax Code Ann. § 112.053(b) (West 2008). At the time of trial, Karpod had not paid the SOB tax under protest or filed a written protest as contemplated by section 112.053 because the first SOB tax payments were not yet due.[16] Therefore, when Karpod's UDJA claim was filed, the constitutionality of the SOB tax was not yet a "reason[] expressed in the written protest" that could be raised in a tax-protest suit.[17] *Id.* The Texas Supreme Court has held that taxpayers have a constitutional right to obtain judicial review of tax liability by means of a prepayment declaratory action. *See R Commc'ns, Inc. v. Sharp*, 875 S.W.2d 314, 317-18 (Tex. 1994) (holding tax code provision prohibiting declaratory actions and requiring taxpayers to seek relief through protest suit to be unconstitutional); *see also Bandag Licensing*, 18 S.W.3d at 305 (tax code provision prohibiting award of attorneys' fees in declaratory-judgment action is "an unconstitutional barrier to access to the courts"). At the time Karpod's UDJA claim was filed, it had a constitutional right to a declaratory judgment regarding its tax liability and such a declaration was not redundant to any remedy available under the tax code. As

---

[16] The trial court's judgment declaring the tax unconstitutional was issued on March 28, 2008, and the order awarding attorneys' fees was issued April 11, 2008. Karpod did not pay the tax under protest or file its written protest letter until April 21, 2008, the date that the first SOB tax payments became due.

[17] TEA, for that matter, had no access to a tax-protest suit at any time during this litigation because it is not a taxpayer for SOB tax purposes. As a result, TEA's claim under the UDJA is not a redundant remedy preventing an award of attorneys' fees.

18

a result, the trial court did not abuse its discretion in awarding attorneys' fees under the UDJA. The Comptroller's fourth issue is overruled.

## CONCLUSION

We affirm the trial court's judgment declaring that subchapter B of chapter 47 of the business and commerce code is unconstitutional and permanently enjoining assessment and collection of the tax.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson;
   Concurring Opinion by Chief Justice Jones
   Dissenting Opinion by Justice Puryear

Affirmed

Filed:   June 5, 2009